## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **GARY MILTON,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:14-cv-00351-TES** |
| **C.R. BARD, INC.,** *et al.,* | |
| *Defendants.* | |

## ORDER

Plaintiff Gary Milton ("Milton") sued Defendants C.R. Bard and Bard Peripheral Vascular, Inc. (collectively referred to as "Bard") for damages he claims he suffered as a result of using Bard's "Bard G2X" inferior vena cava ("IVC") filter. [Doc. 1]. Bard moves the Court to exclude the testimony of Dr. Robert M. McMeeking ("Dr. McMeeking"), Dr. Luke Brewster ("Dr. Brewster"), and to grant it summary judgment on Milton's claims. [Doc. 40].

## BACKGROUND

Milton received a Bard G2X[1] IVC filter after he suffered injuries in an automobile accident. [Doc. 51, p. 2]. Bard's IVC filters are designed to prevent large blood clots in the lower part of the body from traveling to the heart, lungs, or brain, and thereby

---

[1] The "G2X" filter at issue in this case is part of the Bard "G2" filter line. The G2X is essentially the same as the G2 filter, but with an added snare hook that is meant to improve the retrievability of the filter. [Doc. 51, p. 3].

reduce the risk of a life-threatening pulmonary embolism. [Doc. 40, p. 3]. Milton later learned that his IVC filter had tilted so that its struts penetrated his IVC and protruded into his abdominal aorta. [Doc. 51, p. 2]. Milton says this caused a pseudoaneurysm, and he had the filter removed in May 2014. [*Id*.].

Milton brought claims against Bard under the following theories: negligence, failure-to-warn (strict products liability), design-defect (strict products liability), manufacturing defect (strict products liability), breach of implied warranty of merchantability, negligent misrepresentation, and punitive damages. [Doc. 1, ¶¶ 108–69]. Milton withdrew his negligence and negligent misrepresentation causes of action. [Doc. 51, p. 15]. Therefore, the remaining claims are for failure-to-warn (strict products liability), design-defect (strict products liability), manufacturing defect (strict products liability), breach of implied warranty of merchantability, and punitive damages.

Milton's case originated in the Middle District of Georgia. [Doc. 1]. The United States Judicial Panel on Multidistrict Litigation then transferred Milton's case to the District of Arizona for centralized proceedings.[2] [Doc. 25]. Upon completion of the centralized proceedings, the United States Judicial Panel on Multidistrict Litigation then remanded Milton's case back to the Middle District of Georgia. [Doc. 27].

---

[2] *In Re: Bard IVC Filters Products Liability Litigation* (MDL 2641).

After case-specific discovery, Bard filed a Motion for Summary Judgment [Doc. 40] and contemporaneously filed a motion to exclude the testimony of Dr. McMeeking [Doc. 41]. Milton filed a Response to Bard's Motion for Summary Judgment [Doc. 51] and responded to the motion to exclude Dr. McMeeking's testimony [Doc. 50]. In addition to replying to Milton's response to its two other motions, Bard also filed a Motion to Strike the testimony of Dr. Brewster [Doc. 57].

### DISCUSSION

A.   **Motion to Exclude the Testimony of Dr. McMeeking**

1.   **Prior Daubert rulings in the Bard MDL**

Bard seeks to exclude certain opinions of Dr. McMeeking. [Doc. 41]. As an intial matter, one must recall and understand the "law of the case" as it relates to the expert testimony of Dr. McMeeking. His opinions were introduced as evidence during MDL proceedings and at least one bellwether trial. Therefore, previous rulings in the MDL case may control whether this Court will allow certain opinions of Dr. McMeeking to be admitted in this case.

First, let's understand the arguments the parties are making regarding the interplay between prior Dr. McMeeking-related orders in this MDL and the present *Daubert* motion. "Bard does not dispute that it is bound by the MDL Court's prior *Daubert* ruling concerning Dr. McMeeking's generic opinions—opinions that Bard is not challenging here. Bard disputes, however, that the MDL court's subsequent *Tinlin-*

specific ruling concerning Dr. McMeeking's 'case-specific opinions' is controlling in this case." [Doc. 56, p. 5 n. 3].

Thus, Bard clarified that it does not dispute the MDL court's February 8, 2018, *Daubert* ruling on Dr. McMeeking's "generic" opinions. [Doc. 27-5, pp. 82–91]; [Doc. 56, p. 5 n. 3]. There, Judge Campbell made the following rulings regarding the admissibility of Dr. McMeeking's testimony:

- the court will rule on specific objections at trial regarding Dr. McMeeking's opinion that Bard did not go far enough to reduce filter risks

- "The Court will exclude Dr. McMeeking's opinion that Bard was not 'frank and honest' with the FDA. Dr. McMeeking may, however, opine from an engineering perspective that certain information Bard provided to the FDA is incorrect." [Doc. 27-5, p. 88].

- Upon representation by Plaintiffs that Dr. McMeeking would not opine that the filters' complication rates indicate the filters are "dangerous," the court did not exclude that opinion pre-trial, but stated that Defendants may object at trial if Dr. McMeeking renders such an opinion.

- And finally, "The Court will not grant Defendants' request to preclude Dr. McMeeking from opining that the SNF is a safer device than Bard retrievable filters. But he may not opine that the SNF would have been a safer alternative for any particular plaintiff." [Doc. 27-5, p. 91].

Bard agrees that Judge Campbell's rulings on these above-mentioned opinions are the law of the case. Bard takes issue, however, with giving the MDL court's *Daubert* ruling in the *Tinlin* case any "controlling power" here. [Doc. 56, p. 5 n. 3]. In that order [Doc. 27-5, pp. 123–30], Judge Campbell stated that he could not "conclude that Dr. McMeeking (or any other expert in this MDL) should be precluded from restating general opinions in case-specific reports to provide necessary context and a basis for case-specific opinions." [Doc. 27-5, p. 124]. The Court agrees that this ruling is not binding, but the Court also notes that it may consider the *Tinlin* order just as it routinely considers orders from other district courts that are helpful to the case at hand.

### 2.    **Dr. McMeeking's Opinions Regarding Milton**

Dr. McMeeking's Report [Doc. 43-4, pp. 1–56] includes his conclusions about the Bard filter product generally, and his conclusions about how what happened with Milton's filter is consistent with his general conclusions.[3] [Doc. 44, pp. 2, 54]. Specifically, Dr. McMeeking's Report ultimately concludes that

> Bard therefore failed to undertake an appropriate level of care in its design of the Recovery and the G2 filters and its level of engineering proficiency and ability was well below the level that one expects in the design and creation of a product to be implanted in patients.  It is therefore reasonable to conclude that the perforation and tilt observed for the Milton filter was a result of an unacceptable design.

---

[3] Dr. McMeeking's report includes opinions on Bard's G2 line of filters generally. *See* [Doc. 44, p. 3 ("This report provides a broad assessment of the performance of the Recovery and G2 . . . .")]. The G2X filter is part of the G2 line, and, as discussed above, is essentially just a G2 filter with an added retrieval hook. [Doc. 51, p. 3].

[Doc. 43-4, p. 2].

   3.  **Arguments of the parties**

   In its *Daubert* motion, Bard seeks "to exclude Dr. McMeeking's opinions regarding alternative designs, including whether any specific alternative design would have reduced the risk of complications experienced by Mr. Milton." [Doc. 41, p. 3]. Specifically, Bard argues that Dr. McMeeking's opinions are "pure speculation" because he cannot say whether his alternative designs would have made a difference for Milton. [*Id*. at p. 13]. In other words, Dr. McMeeking's comparisons of the Bard G2X filter to the various alternative designs do not "take into account Mr. Milton's unique medical conditions" and therefore do not "fit" Milton's case. [*Id*.]. Further, Bard argues that Dr. McMeeking should be precluded from opining that the SNF filter is an alternative design for Milton. [*Id*.]. Bard finally argues that Dr. McMeeking's opinions are unreliable because he has done no "testing, calculations, designs, or drawings" of the various alternative designs, and because his opinions are not peer-reviewed or generally accepted. [*Id*. at pp. 14–18].

   Milton counters that "each and every one of Bard's arguments regarding Dr. McMeeking's general alternative design opinions was considered and rejected in the Bard MDL, and for good reason. At best, as Judge Campbell held, Bard's complaints are proper fodder for cross examination." [Doc. 50, p. 4]. Specifically, Milton argues that Bard's *Daubert* motion should be denied because it "seeks to exclude a straw-man case-

specific opinion not offered by Dr. McMeeking," and "it is an improper, late attempt to challenge general opinions of Dr. McMeeking offered and affirmed in the MDL." [Doc. 50, p. 2].

### 4.   **Daubert Standard**

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rulings on the admissibility of expert testimony—like all evidentiary rulings— necessarily involve the exercise of the Court's discretion. *See Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011). Trial courts are to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589, n.7 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). Expert testimony is admissible if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems. Inc*., 158 F.3d 548, 562 (11th Cir. 1998)). The "'burden of establishing qualification, reliability and helpfulness'" lies with the party offering the expert opinion. *McClain v. Metabolite lnt'l. Inc.,* 401 F.3d 1233, 1238 (11th Cir.2005) (quoting *Frazier*, 387 F.3d at 1260).

In assessing whether an expert's methodology is reliable, the Court generally should consider the following factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community." *Adams v. Lab. Corp. of Am*., 760 F.3d 1322, 1327 (11th Cir. 2014) (per curiam). These factors, of course, represent a non-exhaustive list and "'do not constitute a definitive checklist or test.'" *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). "While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's 'gatekeeping inquiry must be tied to the facts of a particular case.'" *Id*. (quoting *Kumho Tire*, 526 U.S. at 150).

In its gatekeeping role, the Court's focus must be on the reliability of the testimony, not simply whether it fits within the narrow confines of lawyer-urged litmus tests. While "'each stage of the expert's testimony [must] be reliable, . . . each stage must

[also] be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Frazier*, 387 F.3d at 1262 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999)). The Court's goal is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. at 1260 (quoting *Kumho Tire*, 526 U.S. at 152). "Sometimes the specific [traditional] *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Id*. at 1262. Testimony that the parties plan to present to a jury must be "'properly grounded, well-reasoned, and not speculative.'" *Id*. (quoting Fed. R. Evid. 702 advisory comm. note (2000 amends)).

Finally, the Court must assess whether the expert testimony helps the trier of fact. This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262–63. "Nor does expert testimony help the trier of fact if it fails to 'fit' with the facts of the case." *Stoner v. Fye*, No. 5:15-cv-102 (CAR), 2017 WL 2434461, at *4 (M.D. Ga. June 5, 2017) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)). "Expert testimony lacks 'fit' when 'a large analytical leap must be made between the facts and the opinion.'" *Id.* (quoting *McDowell*, 392 F.3d at 1299); *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical

gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. "Thus, the

court may exclude otherwise reliable testimony if it does not have 'sufficient bearing on

the issue at hand to warrant a determination that it [is *helpful* to the trier of fact].'"*Fye*,

2017 WL 2434461, at *4 (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir.

2005)). "At all times when scrutinizing the reliability and relevance of expert testimony,

a court must remain mindful of the delicate balance between its role as a gatekeeper

and the jury's role as the ultimate fact-finder." *Id.*

### 5.  *Daubert* **Analysis**

As a recap, Bard asks the Court to "exclude Dr. McMeeking's opinions regarding

alternative designs, including whether any specific alternative design would have

reduced the risk of complications experienced by Mr. Milton." [Doc. 41, p. 3]. Bard

continues that "Dr. McMeeking's alternative design opinions are pure speculation as

applied to Mr. Milton's case because he cannot opine whether any of his alternative

designs or alternative filters are viable or would have reduced or avoided *Mr. Milton's*

injuries. Plaintiff concedes Dr. McMeeking offers no such opinions in this case." [Doc.

56, pp. 1–2]. Bard also seeks to exclude Dr. McMeeking's opinion that the Simon Nitinol

Filter ("SNF") is a reasonable alternative design in this case. [Doc. 41, p. 5]; [Doc. 56, p.

2].

Again, Bard does not dispute that Judge Campbell's ruling on Dr. McMeeking's

generic opinions are controlling here. [Doc. 56, p. 5 n. 3]. There, Judge Campbell

decided that he "will not grant Defendants' request to preclude Dr. McMeeking from

opining that the SNF is a safer device than Bard retrievable filters. But he may not opine

that the SNF would have been a safer alternative for any particular plaintiff." [Doc. 27-5,

p. 91]. Therefore, the Court, following the law of the case, will allow Dr. McMeeking to

testify that the SNF is a safer device, or a reasonable alternative design, to [the filter

used by Milton], but he may not testify that is was safer for Mr. Milton.[4]

Bard seems to try to get around the fact that Judge Campbell already ruled on

this issue in two ways. First, Bard argues that a *Daubert* analysis will lead to a different

conclusion regarding the admissibility of Dr. McMeeking's testimony in this case

because Georgia products liability law applies here and Judge Campbell's ruling on Dr.

McMeeking's "generic" opinions was not cabined to Georgia law. *See* [Doc. 41, p. 2

("Plaintiff has provided a case-specific expert report in this case that fails to address the

heart of his design claim under Georgia law.")]. And second, Bard argues that even if

Dr. McMeeking's testimony is reliable in a general sense, it is not reliable in the Milton-

---

[4] It is necessary to provide a point of clarification on precisely what Judge Campbell's ruling—the law of the case—is on this point. Judge Campbell noted: "Defendants argue that Dr. McMeeking is not qualified to opine that the SNF would have been a safer alternative for any particular plaintiff . . . [and] [p]laintiffs agree." [Doc. 27-5, p. 91]. What does "would have been a safer alternative for any particular plaintiff" mean? The Court knows what it does not mean. As explained in the Court's analysis, Dr. McMeeking's testimony is being offered to show that the alternative design would have reduced the risk of injury, not that it would have prevented Milton's injury. The Court knows that the law of the case does not prevent Dr. McMeeking from giving such an opinion because in *Tinlin*, a bellwether trial subject to the same law of the case as Milton's case is here, Judge Campbell permitted Dr. McMeeking to testify that the "alternative design features" "would have helped mitigate the failures that occurred in Ms. Tinlin's filter." [Doc. 27-5, p. 128]. Therefore, Dr. McMeeking's opinion that the alternative design would have reduced the risk to Milton is not excludable on law-of-the-case grounds.

specific context. *See* [*id*. at p. 6 ("Dr. McMeeking did not factor in any specifics about

Mr. Milton when purportedly arriving at his 'case-specific' opinions on alternative

designs for the G2 line of filters.")].

Both of these issues were considered by Judge Campbell in the *Tinlin*[5] case. *See In*

*re Bard IVC Filters Prods. Liab. Lit.*, No. MDL15-2641-PHX DGC, No. CV16-0263-PHX-

DGC, 2019 WL 1615080 (D. Ariz. Apr. 16, 2019); [Doc. 27-5, pp. 123–30]. The *Tinlin* case,

like this one, took place after common issues in this MDL were resolved, and after

Milton filed Dr. McMeeking's general opinions about the Bard Recovery filters. *See*

[Doc. 27-5, pp. 123–24]. Bard then filed Dr. McMeeking's Tinlin-specific report. In it, Dr.

McMeeking restated general opinions, those already stated during centralized

proceedings, in order to provide context for a case-specific opinion about Tinlin herself.

Dr. McMeeking opined that, among other things, "Incorporation of [alternative design]

features would have helped to mitigate or eliminate the failures [Dr. McMeeking]

identified and that occurred in Ms. Tinlin's filter." [*Id*. at p. 126].

Bard argued there, as it argues here, that Dr. McMeeking cannot say whether the

design changes would have prevented Tinlin's injuries, therefore his opinions about

Tinlin are unreliable and do not "fit" as required by *Daubert* and Federal Rule of

Evidence 702. [Doc. 27-5, p. 126]. Judge Campbell rejected those arguments for two

---

[5] *Tinlin* was one of three bellwether trials held before Judge Campbell.

reasons. First, the Wisconsin products liability statute, which applied in *Tinlin*, required a plaintiff to show that a reasonable alternative design would have reduced the risk of harm. [*Id*.]. Therefore, reasoned Judge Campbell, Tinlin did need not to show that the reasonable alternative designs would have prevented her harm, just that they would have reduced the risk of that harm occurring. [*Id*.].

Applying Georgia law leads to the same result.[6] Georgia law provides a risk-utility analysis for design defect cases which balances "the risks inherent in a product design against the utility of the product so designed." *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 674 (Ga. 1994). As one district court applying Georgia law has noted, the "existence of a safer alternative design is one the factors that a jury may consider in determining whether a product has a defective design." *In re Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Product Liability Litigation*, 431 F.Supp.3d 1033, 1041 (S.D. Ind. 2020) (citing *Banks*, 450 S.E.2d at 675 n. 6). "Alternative safe design factors include: the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; and the adverse effects from the alternative." *Banks*, 450 S.E.2d at 675 n.6. Therefore, Dr. McMeeking's testimony regarding reasonable alternative designs, even if not tailored to Milton, are still helpful to the trier of fact here.

---

[6] The parties agree that Georgia substantive law applies here. *See* [Doc. 40, p. 6]; [Doc. 51, p. 11].

Bard next argued in *Tinlin*, as it does here, that Dr. McMeeking's opinion regarding reasonable alternative designs was formed without considering Tinlin's anatomy and medical history. Therefore, Bard argued that Dr. McMeeking could not say whether the alternative designs would have reduced the risk to Tinlin. [Doc. 27-5, p. 127]. Judge Campbell rejected this argument, noting that "Dr. McMeeking is not required to state with certainty that the design changes would have eliminated all risk of harm, or to quantify the reduced risk, in order for his opinions to be reliable and helpful to the jury. Defendants will be free to assert through cross-examination that Dr. McMeeking did not consider Ms. Tinlin's anatomy and medical history." [*Id*.]. To be clear, Dr. McMeeking did review Milton's medical records. [Doc. 44, p. 54 ("We have been provided with the medical records of Mr. Gary Milton relevant to his G2 filter. It is our understanding of these records that . . . .")]. Ultimately, the Court reaches the same conclusion as Judge Campbell. To the extent Bard argues that Dr. McMeeking's review of Milton's file is insufficient for him to be able to reliably opine on the effect the reasonable alternative designs would have had in reducing the risk of harm to Milton, Bard may plow that ground with him through vigorous cross examination. In sum, Bard's criticism that Dr. McMeeking failed to tailor the inputs to his opinion-forming process to Milton goes to the weight, not the admissibility, of his testimony.

Finally, the Court finds Bard's argument that Dr. McMeeking's testimony is unreliable because he did no testing, calculations, designs, or drawings, and that his

opinions are unreliable because they are not peer-reviewed, no rate of error is calculated, and the opinions are not generally accepted to be unpersuasive. *See* [Doc. 41, pp. 14–18]. Again, Judge Campbell considered those same objections in the *Tinlin* case and rejected them. Judge Campbell reasoned that Bard's arguments "do[] not preclude the jury from finding that these features are reasonable alternative designs." [Doc. 27-5, p. 127]. Judge Campbell noted that the "lack of testing and analysis goes to the weight of Dr. McMeeking's opinions, not their admissibility." [*Id*.].

Bard relies heavily on the principle articulated by the Fourth Circuit in *Nease v. Ford Motor Co.*, that a lack of testing renders an expert's testimony unreliable and thus inadmissible. 848 F.3d 219, 234 (4th Cir. 2017); [Doc. 41, pp. 15–17]. Bard also argues that Dr. McMeeking's testimony is unreliable because it is not peer-reviewed, he cannot calculate a rate of error, and his opinions are not generally accepted. [Doc. 41, pp. 17–18]. True, "whether the expert's theory can be and has been tested," "whether the theory has been subjected to peer review and publication," "the known or potential error rate of the technique," and "whether the technique is generally accepted in the scientific community" are all factors the Court generally considers when examining the reliability of expert testimony. *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir. 2014) (per curiam). But as explained above, these factors represent a non-exhaustive list and "'do not constitute a definitive checklist or test.'" *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). "While those factors may help in assessing the reliability of

scientific or experience-based expert testimony, the district court's 'gatekeeping inquiry must be tied to the facts of a particular case.'" *Id*. (quoting *Kumho Tire*, 526 U.S. at 150).

Doing so, the Court finds (as did Judge Campbell in the *Tinlin* case) Dr. McMeeking's report reliable notwithstanding the lack of a showing on the specific factors relied on by Bard. [Doc. 27-5, pp. 123–130]. At the end of the day, Dr. McMeeking's report meets the minimal standards for the Court to conclude it is thorough and reliable enough to be admissible at trial. *See* [Doc. 44, pp. 1–56]. Topics such as the lack of peer-review, testing, rate of error, and unaccepted techniques contained in Dr. McMeeking's opinions should provide a target-rich environment for Bard's skilled attorneys on cross examination.

Lastly, when it comes to the lack of testing of alternative designs, Milton's case is distinguishable from *Nease*. In *Nease*, the expert testimony at issue focused on whether taking certain precautions would have *prevented* plaintiff's injury. *Nease*, 848 F.3d at 234. Since the expert did no testing, the Court found his opinion that the alternative design would have prevented the accident to be unreliable. *Id*. Unlike in *Nease*, Dr. McMeeking is not testifying as to whether the alternative designs would have prevented Milton's injuries. Instead, Dr. McMeeking is testifying as to whether the alternative designs would have reduced the *risk* of the injury. [Doc. 44, p. 54 ("[Milton's filter] does not provide sufficient safeguards against tilt, which increases the likelihood of perforation, which in turn increases the likelihood of fracture.")]. After all, under Georgia products

liability law, a plaintiff must only show that a reasonable alternative design "could have prevented or minimized the plaintiff's injury." *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 675 (Ga. 1994). Therefore, because Milton is not proffering Dr. McMeeking's testimony to show the alternative filter designs would have prevented his injury, but that they could have reduced the risk of the injury, the reasoning in *Nease* is not persuasive here. Again, Dr. McMeeking's lack of testing of the alternative designs is an appropriate topic for cross examination at trial.

In conclusion, Bard's Motion to exclude the testimony of Dr. McMeeking [Doc. 41] is **DENIED**.

**B.      Motion to Strike the Testimony of Treating Physician Dr. Brewster**

Bard next moves to strike[7] the Declaration of Dr. Brewster [Doc. 53-4]. [Doc. 57]. Dr. Brewster was the attending surgeon who placed an aortic cuff on Milton. [Doc. 53-4,

---

[7] As a threshold matter, Milton argues that Bard's Motion to Strike should be denied because it is the inappropriate vehicle to challenge Dr. Brewster's declaration. [Doc. 58, p. 4]. Federal Rule of Civil Procedure 12(f) allows a district court to "strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." (emphasis added). Federal Rule of Civil Procedure 7(a) lists the filings that count as pleadings: a complaint, an answer, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer. Therefore, a motion to strike is not the proper vehicle to challenge an affidavit or declaration. *See Southard v. State Farm Fire and Cas. Co.*, 2013 WL 209224, at *7 (S.D. Ga. Jan. 17, 2013) (citing *Jordan v. Cobb Cnty., Ga.*, 227 F.Supp.2d 1322, 1346-47 (N.D. Ga. 2001)). The proper way to challenge Dr. Brewster's declaration is "to challenge the admissibility of the evidence contained in the affidavit." *Id*. However, following the example set in *Southard*, the main case relied on by Milton to support its argument that Bard's motion should be denied on this ground, the Court will consider the merits of Bard's motion notwithstanding the fact it used the incorrect procedural vehicle to raise them. *Id*. at *7 (noting that courts may only consider admissible evidence when deciding a summary judgment motion).

p. 1]. Dr. Brewster testified that Milton required the aortic cuff to be placed because Milton's IVC filter, placed several years earlier, perforated through the caval wall. [*Id*. at pp. 1–2]. Dr. Brewster described that he saw radiological imaging of tines from the filter protruding outside the IVC. [*Id*. at p. 2]. Dr. Brewster also opined that, among other things, "the aortic pseudoaneurysm that was found in Mr. Milton was caused by the IVC filter tine perforating outside the IVC wall and causing a penetrating injury to the aortic wall." [*Id*.].

Bard argues that the Court should exclude Dr. Brewster as a witness because Milton did not properly disclose him under Federal Rule of Civil Procedure 26(a)(2)(C). [Doc. 57, pp. 1–2]. According to Bard, Milton waited until after the close of discovery, and after Bard filed its Motion for Summary Judgment—which pointed out Milton's alleged shortage of required expert testimony on the issue of causation—to surprise Bard with Dr. Brewster's expert opinion. [*Id*. at p. 2]. Bard complains that neither party ever deposed Dr. Brewster. Bard argues, therefore, that Dr. Brewster's "expert opinions on causation should be stricken and he should be limited to testifying only as a lay witness about his observations made during the course of Mr. Milton's treatment." [Doc. 57, p. 7]. Milton responds that he properly designated Dr. Brewster as both a fact and non-retained expert witness under Federal Rule of Civil Procedure 26(a)(1) and 26(a)(2)(C). [Doc. 58, p. 1].

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." This gives rise to a two-step analysis for determining whether Dr. Brewster's declaration is admissible: (1) did Milton's disclosures comply with Rule 26(a)? and (2) if Milton did not comply with Rule 26(a), was that failure substantially justified or harmless? As detailed in the analysis below, the Court concludes Milton's disclosure of Brewster complied with Rule 26(a), albeit barely.

### 1.    Non-Retained Expert Witness Disclosure Requirements

Milton and Bard agree that the Court may not consider Dr. Brewster's declaration unless Milton complied with Rule 26(a)(2)(C).[8] *See* [Doc. 57, pp. 4–5]; [Doc. 58, p. 3]. In the context of retained expert witnesses, meaning those a party has hired for the purpose of giving expert testimony, parties are required to make extensive disclosures including a detailed written report. *See* FED. R. CIV. P. 26(a)(2)(B). But Rule 26 distinguishes between retained and non-retained experts. *See Vaughn v. United States*, 542 F.Supp.2d 1331, 1336 (S.D. Ga. 2008). Rule 26(a)(2)(C), which applies to the testimony of non-retained experts, such as treating physicians like Dr. Brewster, does

---

[8] Milton does argue, however, that even if he fails under Rule 26, the unique nature of treating physician testimony allows for an exception. *See* [Doc. 58, p. 3]. However, the Court doesn't need to analyze this fallback argument.

not require nearly as much. It provides that "[u]nless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." "[D]isclosure under Rule 26(a)(2)(C) for non-retained experts is considerably less extensive than the report required by Rule 26(a)(2)(B) for retained experts, and [c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have." *Adacel, Inc. v. Adsync Techs., Inc.*, No. 6:18-cv-1176-Orl-78EJK, 2020 WL 4588415, at *3 (M.D. Fla. July 9, 2020) (quoting *United States v. An Easement & Right-of-way Over 6.09 Acres of Land, More or Less, in Madison Cty.*, 140 F. Supp. 3d 1218, 1244 (N.D. Ala. 2015)).[9]

## 2.    Milton's Disclosure of Dr. Brewster

Milton and Bard agree than Milton served his disclosures on June 8, 2015, designating Dr. Brewster and six other treating physicians as non-retained experts. [Doc. 58, p. 2]; [Doc. 57, p. 2]; [Doc. 58-2, pp. 4–6]. In that disclosure, Milton lists Dr. Brewster as one of Milton's seven treating physicians for whom an export report is not

---

[9] Prior to the 2010 amendment to Rule 26, many courts found that whenever a treating physician goes beyond giving lay opinion about her observations and into the realm of rendering opinion testimony, a full-blown expert report is to be filed pursuant to Rule 26(a)(2)(B). But the comments to the 2010 amendment make it clear that a non-retained treating physician is subject to the lesser 26(a)(2)(C) disclosure requirements.

required. [Doc. 58-2, pp. 4–5]. Milton provided the exact same boilerplate language for Dr. Brewster and the other six doctors—explaining that his seven doctors "may testify as to the medical treatment rendered to the Plaintiff, diagnosis(es), observations, perceptions, prognosis, and the reasons such care was rendered, including but not limited to testimony that the failure of the IVC filter caused the device to penetrate through his vena cava into his aorta, and what care may be necessary in the future for the Plaintiff." [*Id*. at p. 6]. Then, on August 20, 2015, the Judicial Panel on Multidistrict Litigation ordered Milton's case be transferred from the Middle District of Georgia to the District of Arizona for consolidated pretrial proceedings. [Doc. 25]. On September 4, 2019, the case returned to the Middle District of Georgia. [Doc. 27]. Milton then filed the same disclosures about Dr. Brewster and Milton's six other treating physicians using the same language as the 2015 disclosure referenced above. [Doc. 58-3, pp. 6–8].

### 3.    Dr. Brewster's Declaration

After Bard filed its Motion for Summary Judgment [Doc. 40], Milton filed a Response [Doc. 51] and included the Dr. Brewster declaration [Doc. 53-4]. The declaration includes Dr. Brewster's account of Milton's March 18, 2013, aortic cuff placement procedure. Dr. Brewster included many observations and opinions in his declaration, including the following:

- "The reason that Mr. Milton required placement of an aortic cuff was because the IVC filter that had been placed in his body several years earlier was determined to have perforated through the caval wall." [Doc. 53-4, pp. 1–2].

- "Radiological imaging and direct visualization at the time of surgery confirmed that several tines from the filter were protruding outside the inferior vena cava and into the adjacent space. One of the tines was piercing the aortic wall and had caused a pseudoaneurysm.  An aortic pseudoaneurysm is a collection of blood that forms between the outer layers of the aortic wall. Aortic pseudoaneurysms are most commonly associated with a penetrating injury to the vessel which then bleeds but forms space between the two layers of the vessel wall.  This results in an area of potential weakness that could lead to rupture and bleeding." [*Id*. at p. 2].

- "In Mr. Milton's case the aortic pseudoaneurysm was caused by the strut from his IVC filter penetrating through the aortic wall." [*Id*.].

- "In my opinion the aortic pseudoaneurysm that was found in Mr. Milton was caused by the IVC filter tine perforating outside the IVC wall and causing a penetrating injury to his aortic wall. The presence of the metal tine perforating into the aortic wall at the site of the pseudoaneurysm confirmed this diagnosis." [*Id*.].

22

- "Mr. Milton would not have required surgery to place the aortic cuff on March 18, 2013 if the IVC filter had not pierced his aortic wall." [*Id*.].

### 4.    Analysis of Milton's Rule 26(a)(2)(C) Disclosures

Milton's disclosures of Dr. Brewster includes the subject matter, facts, and opinions to which Dr. Brewster expects to testify. *See* FED. R. CIV. P. 26(a)(2)(C). Milton's disclosure states that Milton (and the six other treating physicians) "may testify as to the medical treatment rendered to the Plaintiff, diagnosis(es), observations, perceptions, prognosis, and the reasons such care was rendered, including but not limited to testimony that the failure of the IVC filter caused the device to penetrate through his vena cava into his aorta, and the penetration of the device through his vena cava and into his aorta was the reason he needed open surgery and a complex retrieval procedure." [Doc. 58-3, p. 8]. This disclosure states the subject matter and facts Dr. Brewster expects to testify to: Milton's IVC retrieval procedure. It also states the opinion to which Dr. Brewster might testify: that the failure of the IVC filter caused the device to penetrate the vena cava, and what that event led to. Therefore, on its face, it seems as though Milton's disclosure of Dr. Brewster satisfies Rule 26(a)(2)(C)'s "less extensive" requirements. *Adacel*, No. 6:18-cv-1176-Orl-78EJK, 2020 WL 4588415, at *3.[10]

---

[10] To the extent Milton argues that he provided his medical records to Bard and thus satisfies the "summary of facts and opinions" prong, that argument fails. *See Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *6 (N.D. Ga. Mar. 21, 2013) ("Further, the fact that plaintiff provided all his medical records to the defendants does not mean that plaintiff has fulfilled the "summary of the facts and opinions" prong of Rule 26(a)(2)(C).").

Bard argues that Milton's disclosure of Dr. Brewster as an expert nevertheless fails because of its "boilerplate" nature. [Doc. 59, p. 2]. True, in Milton's non-retained expert disclosure, he lists Dr. Brewster as one of seven non-retained "treating physician" or "healthcare professional" experts. [Doc. 58-3, pp. 6-9]. Also true, Milton provides one summary applicable to all seven experts. [*Id*.]. Bard cites to an order from the Western District of Wisconsin for the rule that, when considering the sufficiency of Rule 26(a)(2)(C) disclosures, "A non-retained expert witness disclosure is inadequate if it merely repeats the exact same set of boilerplate language for a number of experts without giving nuance to the specificities on which each will opine." [Doc. 57, p. 5 (quoting *Jaworek v. Mohave Trans. Ins. Co.*, 19-cv-820-wmc, 2020 WL 3425116, at *2 (W.D. Wis. June 23, 2020))]; [Doc. 59, p. 2 (same)].

Bard cites to a number of examples of district court orders finding various Rule 26(a)(2)(C) disclosures inadequate. *See, e.g.,* [Doc. 57, pp. 6-7]. Because the Eleventh Circuit has not yet clarified what the minimum disclosure requirements of non-retained treating physicians are under Rule 26(a)(2)(C), an examination of the facts of the cases cited by Bard is illustrative.

In *Jaworek*, the plaintiff initially filed a list of twenty non-retained experts and essentially the same disclosure for each, which stated: "Will testify regarding Kenneth F. Jaworek's medical history, his injuries, and the care, costs, and treatment provided. He will also opine as to causation, permanency, future treatment, and reasonableness of

24

medical treatment." 19-cv-820-wmc, 2020 WL 3425116, at *1–3. The court found that this disclosure was inadequate under Rule 26(a)(2)(C). However, plaintiff amended his list, whittled it down from twenty to seven non-retained experts, and enhanced his summary to say things like " Dr. James Bell will testify that Jaworek sustained retinal breaks in the collision, necessitating retinal detachment surgery," and "his audiologist's disclosure, noting that she will testify that the collision caused 'permanent bilateral sensorineural hearing loss and tinnitus.'" *Id*. at *2. As amended, the court found that the disclosures were sufficient under Rule 26(a)(2)(C), "albeit just barely." *Id*. at *3.[11]

In *Martin v. Wal-Mart Stores East, LP*, the treating physician expert disclosures stated that the doctors "will testify as to [their] medical treatment of Plaintiff, as well as causation." No. cv418-197, 2020 WL 5949222, at *1-3 (S.D. Ga. Oct. 7, 2020) (Ray, Mag. J.). The Magistrate Judge reasoned that "even under [Rule 26](a)(2)(C)'s lesser requirements, the disclosure here was insufficient." *Id*. at *2.

In *Kondragunta v. Ace Doran Hauling & Rigging Co.*, the court found that plaintiff complied with Rule 26(a)(2)(C)(i)'s subject-matter requirement when the plaintiff disclosed "that these physicians would be testifying regarding their treatment of the plaintiff, their evaluation of plaintiff, the injuries caused by the collision, plaintiff's medical records, plaintiff's prior treatment and future prognosis and treatment, and any

---

[11] Milton seems to make arguments based on the flawed presumption that this is a matter of state law. But the district court opinions being cited are those of federal courts interpreting the federal rules of civil procedure.

other opinions contained in their medical records." No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *6 (N.D.Ga. Mar. 21, 2013). But the court found that the plaintiff did not comply with Rule 26(a)(2)(C)(ii)'s fact and opinion summary requirement. *Id*. Plaintiff simply left that part out. *Id*. The court noted, therefore, that "[t]he reader of plaintiff's disclosure has no idea what opinion the doctor will offer or on what facts the doctor will base that opinion." *Id*.

In *Small v. Amgen, Inc.*, the plaintiff provided the same "Summary of Testimony" for each of the non-retained treating physicians: "[Physician] will discuss [his / her] medical records providing treatment to Ms. Small. [He/She] will discuss the relationship between Enbrel and infections and Enbrel and Ms. Small's infections. [He/She] will also discuss the nature of her injuries and treatment required as a result of the injuries." No. 2:12-cv-476-FtM-PAM-MRM, 2017 WL 5443912, at *4 (M.D. Fla. Feb. 15, 2017) (McCoy, Mag. J.). The court reasoned that these summaries "essentially tell Defendants nothing about the opinions the physicians will offer or the facts on which the physicians will base those opinions." *Id*.

In *Torres v. Walmart Stores East, L.P.*, the plaintiff provided in its disclosure that each of the treating physicians will testify as to "the opinions he formed in regard to her medical condition during the court [sic] of his treatment of Plaintiff," "the diagnostic impressions he made during treatment of Plaintiff," and "his opinion as to the necessity of the diagnostic arthroscopic surgery." No. 16-60984-CIV-LENARD/GOODMAN, 2017

WL 8780915, at *2 (S.D. Fla. June 9, 2017) (Goodman, Mag. J.). The Magistrate Judge

reasoned that "the disclosures do not identify *what the opinions are*. In fact, they do not

even *hint* at the nature of the opinions." *Id* (emphasis in original).

Milton's disclosure does not suffer from the fatal pitfalls that the above-

mentioned cases suffered from. Milton does not just disclose the topic on which Dr.

Brewster will give an opinion, such as "causation" or "his opinion as to the necessity of

the diagnostic arthroscopic surgery." *See Martin*, No. cv418-197, 2020 WL 5949222, at *1-

3; *Torres*, No. 16-60984-CIV-LENARD/GOODMAN, 2017 WL 8780915, at *2. Instead,

Milton discloses both (1) what subject matter he will opine on; and (2) what his opinion

on that topic actually is. Further, the fact that a single summary is given for more than

one, or even seven, non-retained experts does not transform a disclosure that otherwise

complies with Rule 26(a)(2)(C) into one that does not. While the law is clear that a

plaintiff providing medical records alone does not satisfy Rule 16(a)(2)(C)'s

requirements, the production of medical records can bolster the sufficiency of the fact

and opinion disclosures explicitly made. *See, e.g., Jaworek*, 19-cv-820-wmc, 2020 WL

3425116, at *3 ("The amended disclosures provide both a summary of the facts and

opinions, especially when considered in conjunction with production of medical

records.").

Bard also argues that Milton's disclosure fails because the opinion Dr. Brewster

gives in his declaration is not the same opinion listed in the expert disclosures. [Doc. 59,

pp. 3–4]. Specifically, Bard argues that the disclosure did not identify the opinion Dr. Brewster rendered in his declaration that "the G2 filter's perforation into the aortic wall caused the aortic pseudoaneurysm, placing Mr. Milton at risks (sic) for serious injury or death and necessitating surgery to place the aortic cuff."[12] [*Id*. at p. 4]. This argument misses the mark.

First, Rule 26(a)(2)(C) requires a summary of "expected" opinions. Thus, the Rule is not violated just because the actual opinion varies from the disclosed expected opinion. Second, Bard's argument relies on a stricter disclosure standard that simply is not applicable here. Rule 26(a)(2)(B), which applies to retained experts, requires "a complete statement of *all* opinions the witness will express." FED. R. CIV. P. 26(a)(2)(B)(i) (emphasis added). Again, Dr. Brewster is a non-retained expert, therefore his disclosures are governed by Rule 26(a)(2)(C), and thus need not include all opinions that he might give, just those that Milton expected him to give at the time of filing.

In conclusion, the Court **DENIES** Bard's Motion to Strike [Doc. 57] the testimony of Dr. Brewster. Milton complied with Rule 26, "albeit barely."

However, the Court does have some empathy for Bard on this point. According to the record, Milton led bard to believe that he would depose Dr. Brewster. [Doc. 32, p.

---

[12] Instead, the disclosure merely stated that "the failure of the IVC filter caused the device to penetrate through his vena cava into his aorta." [Doc. 58-3, p. 8]. In other words, while the disclosure spoke in terms of what caused penetration of the vena cava, the Dr. Brewster declaration went further and spoke of what caused the aortic pseudoaneurysm.

2 ("Plaintiff would also like to depose the physician who removed Mr. Milton's filter and the surgeon who placed Mr. Milton's aortic cuff. Plaintiff has been unable to schedule the needed depositions.")]. And the Court certainly agrees that a lawyer may always rely on the word of its adversary, especially on scheduling and similar discovery matters. In fact, Milton even asked the Court for an extension of the discovery period so that he could, in part, depose Dr. Brewster. Again, Bard was right to rely on that representation. However, Milton ultimately chose not to depose Dr. Brewster and effectively surprised Bard with his affidavit. Whether intentional or not, by not deposing one of the most important—if not the most important—witnesses after representing to the Court that he needed more time to do so, Milton effectively denied Bard a chance to ask Dr. Brewster questions before dispositive motions were filed. Keeping Dr. Brewster out of Bard's reach until after Bard filed its Motion for Summary Judgment plainly helped Milton.

In the event that the Court decided that it would not exclude Dr. Brewster's Declaration, Bard informed the Court that it reserved the right to move to reopen discovery for the limited purpose of deposing Dr. Brewster. The Court agrees. It will not consider Bard's Motion for Summary Judgment until Bard has an opportunity to depose Dr. Brewster. Therefore, the Court *sua sponte* **TERMINATES** Bard's Motion for Summary Judgment [Doc. 40] and re-opens discovery for sixty (60) days for the limited purpose of allowing Bard to depose Dr. Brewster. Then, after this 60-day discovery

period, either party may file updated motions for summary judgment (within 30 days after discovery ends) that hopefully will be more narrowly tailored after receiving Dr. Brewster's testimony or simply proceed to trial.

## CONCLUSION

In summary, the Court **DENIES** Bard's Motion to Exclude the Testimony of Dr. McMeeking [Doc. 41] and **DENIES** Bard's Motion to Strike the Testimony of Dr. Brewster [Doc. 57]. Further, the Court **TERMINATES** Bard's Motion for Summary Judgment [Doc. 40] and **ORDERS** that discovery be re-opened for sixty (60) days for the limited purpose of deposing Dr. Brewster.

**SO ORDERED**, this 6th day of January, 2021.

S/Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**