IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| GARY MILTON,<br><br>*Plaintiff,*<br><br>v.<br><br>C.R. BARD, INC., *et al.,*<br><br>*Defendants*. | CIVIL ACTION NO.<br>5:14-cv-00351-TES |

### ORDER GRANTING IN PART AND DENYING IN PART BARD'S PARTIAL MOTION FOR SUMMARY JUDGMENT

Plaintiff Gary Milton ("Milton") sued Defendants C.R. Bard and Bard Peripheral Vascular, Inc. (collectively referred to as "Bard") for damages he claims he suffered because of using Bard's "Bard G2X" inferior vena cava ("IVC") filter. [Doc. 1]. Before the Court is Bard's Partial Motion for Summary Judgment [Doc. 61] as to Milton's failure-to-warn and punitive damages claims.

### BACKGROUND

On July 1, 2009, Milton was involved in a single-vehicle rollover accident. *See* [Doc. 62, p. 2]. Milton was ejected from the vehicle and sustained injuries to his pelvis,

ribs, lower extremities, and spleen. [*Id*.]. The next day, Dr. Michelle Lung placed a Bard G2X[1] IVC filter in Milton because of his high risk for pulmonary embolism. [*Id*.].

On March 18, 2013, Dr. Brewster was the attending surgeon for Milton when Milton underwent placement of an aortic cuff via his right common femoral artery at the Atlanta VA Medical Center. [Doc. 66-38, p. 2]. Dr. Brewster determined that placement of the aortic cuff was necessary because Milton's IVC filter had perforated through the caval wall. [*Id*. at 2–3]. One of the filter's tines was piercing through the aortic wall causing a pseudoaneurysm. [*Id*. at 3]. Dr. Brewster saw the existence of the pseudoaneurysm as placing Milton at a higher risk for internal bleeding that could result in serious injury or death. [*Id*.]. Dr. Brewster decided to place an aortic cuff next to the tines of the IVC filter to seal the aortic pseudoaneurysm from within the aorta. [*Id*.]. Dr. Brewster and his team completed this phase of Milton's treatment, aiming to actually remove the IVC later by way of a laparotomy. [*Id*.]. On May 23, 2014, Milton's IVC filter was removed. [Doc. 66-1, p. 5].

Bard's IVC filters are designed to prevent large blood clots in the lower part of the body from traveling to the heart, lungs, or brain, and thereby reduce the risk of a life-threatening pulmonary embolism. [Doc. 40, p. 3]. Milton later learned that his IVC

---

[1] The "G2X" filter at issue in this case is part of the Bard "G2" filter line. The G2X is essentially the same as the G2 filter, but with an added snare hook that is meant to improve the retrievability of the filter. *See* [Doc. 51, p. 3]; [Doc. 66-1, p. 19 ("The G2X filter was a very slight modification to the G2, identical in every way save for the addition of a snare hook intended to improve retrievability.")].

2

filter had tilted so that its struts penetrated his IVC and protruded into his abdominal aorta. [Doc. 51, p. 2]. Milton says this caused a pseudoaneurysm, and he had the filter removed in May 2014. [*Id.*].

Milton's case originated in the Middle District of Georgia. [Doc. 1]. The United States Judicial Panel on Multidistrict Litigation then transferred Milton's case to the District of Arizona for centralized proceedings.[2] [Doc. 25]. Upon completion of the centralized proceedings, the United States Judicial Panel on Multidistrict Litigation then remanded Milton's case back to the Middle District of Georgia. [Doc. 27].

After case-specific discovery, Bard filed a Motion for Summary Judgment [Doc. 40] and contemporaneously filed a motion to exclude the testimony of Dr. McMeeking [Doc. 41]. Milton filed a Response to Bard's Motion for Summary Judgment [Doc. 51] and responded to the motion to exclude Dr. McMeeking's testimony [Doc. 50]. In addition to replying to Milton's response to its two other motions, Bard also filed a Motion to Strike the testimony of Dr. Brewster [Doc. 57]. The Court denied Bard's motion to exclude Dr. McMeeking's testimony [Doc. 50] and Motion to Strike the testimony of Dr. Brewster [Doc. 57] and ordered discovery to be re-opened for 60 days for the limited purpose of deposing Dr. Brewster. [Doc. 60].

Milton brought claims against Bard under the following theories: negligence,

---

[2] *In Re: Bard IVC Filters Products Liability Litigation* (MDL 2641).

3

failure-to-warn (negligence and strict products liability), design-defect,[3] manufacturing defect, breach of implied warranty of merchantability, negligent misrepresentation, and punitive damages. [Doc. 1, ¶¶ 108–69]. Milton withdrew his negligence and negligent misrepresentation causes of action. [Doc. 51, p. 15]. Milton also withdrew his breach of implied warranty of merchantability and manufacturing defect claims. *See* [Doc. 61-1, p. 1]. Therefore, only Milton's failure-to-warn (strict products liability), design-defect (strict products liability), and punitive damages claims remain.

Bard's updated Motion for Partial Summary Judgment [Doc. 61] asks the Court to dismiss Milton's failure-to-warn and punitive damages claims, as well as Milton's claims for damages as to his abdominal pain. *See* [Doc. 61, p. 1]. Thus, if the Court grants Bard's motion in full, Milton will be left with only a design-defect claim for trial.

## DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmovant and a fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

---

[3] Bard states in its Motion that it is unsure whether Milton's design-defect claim is sought under a strict liability or negligence theory, so it addresses both theories. *See* [Doc. 61, p. 2 n. 2].

4

considering this motion, "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However, the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

The Court finds the recent Eleventh Circuit summary judgment analysis in *Sconiers v. Lockhart* highly instructive in this case:

> Summary judgment is not a time for fact-finding; that task is reserved for trial. *See, e.g., Tolan v. Cotton*, 572 U.S. 650, 655–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). Rather, on summary judgment, the district court must accept as fact all allegations the non-moving party makes, provided they are sufficiently supported by evidence of record. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). So when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). Indeed, if "the only issue is one of

>credibility," the issue is factual, and a court cannot grant summary judgment. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996).

946 F.3d 1256, 1263 (11th Cir. 2020).

## B. **Bard's Partial Motion for Summary Judgment**

### 1. **Failure to warn**

Bard argues that Milton's failure-to-warn claim fails under the learned intermediary doctrine. *See* [Doc. 61, pp. 7–11]. Milton responds that Bard provided Milton's physician with an inadequate warning, and thus the learned intermediary doctrine does not defeat his failure-to-warn claim. *See* [Doc. 66, pp. 6–10]. "In standard products liability cases premised on a failure to warn, Georgia law insists that a plaintiff show that the defendant had a duty to warn, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010) (citing *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 1362 (N.D. Ga. 1999)); *Cisson v. C.R. Bard, Inc.*, No. 2:11–cv–00195, 2013 WL 5700513, at *8 (S.D.W. Va. Oct. 18, 2013) ("Proving causation [under Georgia law] consists of . . . the plaintiffs [showing] that Dr. Raybon would not have implanted the Avaulta Plus if Bard had provided the warnings the plaintiffs allege should have been provided.").[4]

---

[4] The parties agree that Georgia substantive law applies in this diversity-jurisdiction case. *See* [Doc. 51]; [Doc. 61, p. 6].

Under Georgia's learned-intermediary doctrine, a medical device manufacturer "does not have a duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer." *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*, 711 F.Supp.2d 1348, 1365-66 (M.D. Ga. 2010) (quoting *McCombs v. Synthes*, 587 S.E.2d 594, 595 (Ga. 2003)). In other words, Milton's failure-to-warn claim depends not on the sufficiency of any warning Bard gave to Milton, but on the warning Bard gave to Dr. Lung—the physician who implanted Milton's G2X Filter. "The rationale for the doctrine is that the treating physician is in a better position to warn the patient than the manufacturer, in that the decision to employ [a medical device] involves professional assessment of medical risks in light of the physician's knowledge of a patient's particular need and susceptibilities." *Id.* at 1366 (quoting *McCombs*, 587 S.E.2d at 595). The warnings to the doctor "must be adequate or reasonable under the circumstances of the case." *Id.* (quoting *McCombs*, 587 S.E.2d at 595). "If the warning was inadequate, the plaintiff must show that the deficient warning proximately caused the alleged injury to prevail." *Id.* at 1366. Therefore, the Court's analysis proceeds in two steps. First, the Court will consider whether the warning was inadequate. If the Court is unable to find as a matter of law that the warning was adequate, the Court will next consider whether the deficient warning proximately caused the alleged injury.

### i. *Adequacy of warning*

Bard first argues that it had no duty to warn Milton's physician of risks already known to the medical community. *See* [Doc. 61, pp. 7–8]. Bard points to testimony from Dr. Brewster that provides the risks that all IVC filters carry are known to the medical community, including perforation. [*Id.* at p. 8]. Specifically, Dr. Brewster opined in his deposition that "I believe it's common knowledge that, over time, many of these IVC filters have problems of perforation." [Doc. 64, p. 7:20–22]. In other words, Bard argues that Dr. Lung knew of the risks generally associated with IVC filters, the same risks disclosed on the Bard G2X IFU, [Doc. 66-1, p. 2]—the boilerplate warning that accompanies the filter—and that general warning is adequate and Milton's failure-to-warn claim thus fails.

Milton responds that the Court should let a jury answer the question of whether the warning to physicians was sufficient. *See* [Doc. 66, pp. 6–8]. Specifically, Milton points to multiple cases where district courts reasoned that just because the risks of IVC filters generally—such as perforation risk—are common knowledge among the medical community does not necessarily mean that the increased risk of the G2X filter are common knowledge. [Doc. 66, p. 7]. In other words, Milton argues that the issue here is not whether Bard warned of the dangers associated with IVC filters generally, but whether Bard adequately warned of the risks associated with the G2X Filter—the type placed in Milton's IVC. Therefore, argues Milton, it is a question for the jury whether

Bard had a duty to disclose the increased risk associated with Milton's G2X filter and whether that warning was sufficient. [*Id*.].

The parties hotly dispute whether the G2X filter presents higher risks than IVC filters generally. *Compare* [Doc. 62, p. 4 ("Plaintiff has no evidence that the G2 or G2X Filter has risks higher than those reported [in the 2017 report] regarding IVC Filters.")] *with* [Doc. 66-1, pp. 7–8, 18–21].[5] Milton puts forward evidence that shows the "failure rate for the G2 filter was approximately 14 times that of the SNF," [Doc. 66-1, p. 18], the "G2X suffered from similar rates of complications as the . . . G2 filters," [Doc. 66-1, p. 20], that "the G2 and G2X filters had significantly higher rates of migration, tilt, and perforation than the Recovery," [Doc. 66-1, p. 20], and that "[d]espite these known risks, Bard excluded from the G2X's Instructions for Use ('IFU') any information relating to complications or rates of reported complications specific to the G2X filter, the G2 platform of filters, or Bard's entire line of filters, offering only a short list of 'known complications' found in IVC filters generally." [Doc. 66-1, p. 20].

In *Cason v. C.R. Bard, Inc.*, the plaintiff argued, as Milton does here, that just because Bard's IFU provided a list of warnings related to the IVC filters generally, of

---

[5] Milton relies heavily on data specific to the G2 Filter when showing the complication risk of the G2X. *See* [Doc. 66-1, pp. 19–21]. Because the G2 and the G2X are nearly identical and purportedly share a similar complication rate, and giving Milton, as the nonmovant, the benefit of "justifiable inferences," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Court is satisfied that Milton has put forth evidence showing the G2X has a higher complication rate than IVC filters generally. Milton's reliance on G2 data is something Bard will be free to address on cross examination.

9

which the treating physician was aware, there was nonetheless a failure to warn of the higher risk of the G2 Filter. No. 1:12-cv-1288-MHS, 2015 WL 9913809, at *3 (N.D. Ga. Feb. 9, 2015). The court concluded that since "there is evidence that the G2 Filter has a significantly greater propensity to fracture, migrate, and perforate the IVC than other IVC filters," "there is a genuine issue for trial as to whether the warnings provided by Bard were adequate." *Id*. at *4.

The Bard MDL Court applied Georgia law to reach the same conclusion. *See In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 5625548, at *5 (D. Ariz. Nov. 22, 2017) ("The Court is not holding, as a matter of Georgia law, that manufacturers must always disclose how the risks of their product compare to the risks of other products. But presumably there is a point where the risks of a product so depart from the norm that a failure to disclose them constitutes an inadequate warning. Whether that point was reached in this case will be for the jury to decide." (citing *Cason*, 2015 WL 9913809, at *3)).

Like the MDL Court and the Northern District of Georgia, the Court finds that because Milton presents evidence that his G2X Filter had higher risks of complication than IVC filters generally, it is a jury question whether the warning was adequate. As explained above, Milton places facts in the record that purport to show that the G2X Filter has a complication rate 14 times higher than the SNF—another of Bard's filters. While Bard is of course free to challenge this assertion at trial, the Court has no trouble

10

finding that a jury should have a chance to decide whether Bard should have had to warn of the higher risk associated with the G2X. Therefore, because the Court cannot find as a matter of law that the warning to Milton's physician was adequate, it must proceed to the next step of the analysis and consider whether the deficient warning was the proximate cause of Milton's harm.

    *ii.*   *Proximate cause*

Bard may still be entitled to summary judgment if it can show that the deficient warning was not the proximate cause of Milton's injury. To prove the proximate cause element of a failure to warn claim under Georgia law, a plaintiff must prove: "(1) that the prescribing physician was not aware of the alleged risk at issue, and (2) but for the inadequate warning, the physician would not have used or prescribed the product." *Watkins v. Eli Lilly & Co.*, No. 1:08-CV-1665, 2010 WL 11493785, at *8 (N.D. Ga. Mar. 31, 2010) (citing *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 1363 (N.D. Ga. 1999)); *accord Porter v. Eli Lilly & Co.*, 291 F. App'x 963, 964 (11th Cir. 2008). "If a plaintiff fails to meet this burden, the causal connection is broken, and plaintiff cannot prove that the breach was the proximate cause of his injuries." *Watkins*, 2010 WL 11493785, at *8. Bard argues that Milton does not meet this burden because Dr. Lung—Milton's prescribing physician—was already aware of the specific type of risk that came to pass in Milton before she treated Milton, and that Milton cannot show that "but for" the inadequate warning, Dr. Lung would not have prescribed the product. *See* [Doc. 61, p. 9]. Milton

11

counters by pointing out that Dr. Lung testified that had she known of the higher rates of complications associated with the G2X Filter, she would not have implanted it.

In *Cason*, the defendants argued at summary judgment that when the implanting physician had knowledge that the filter could tilt, fracture, migrate, or perforate, any failure to warn of these risks could not be the proximate cause of the plaintiff's injuries. No. 1:12-cv-001288-MHS, 2015 WL 9913809, at *6. The Northern District disagreed because the implanting physician testified that he would have wanted to know if the G2 Filter had a significantly higher risk of complication than other IVC filters. *Id*. The court found that the implanting physician's testimony was "sufficient evidence of causation at the summary judgment stage, because 'it can be inferred that [Dr. Sheline] would not have implanted the [G2 Filter] had he known of the information.'" *Id*. at *6–7 (quoting *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:10-cv-01224, 2013 WL 2431975, at *7 (S.D. W.Va. June 4, 2013)).

Dr. Lung—Milton's implanting physician—testified in her deposition that even though she was aware of the risks inherent in the use of IVC filters generally, she was not provided any information regarding the comparatively higher rates of complications in the G2X filter as compared to other IVC filters on the market. [Doc. 66-1, ¶ 26]. She testified that she would want to know if the G2X filter had higher rates of complications than other filters, and that had Bard disclosed higher rates of complications associated with the G2X, it would have led her to choose a different IVC

filter for Milton. [*Id*. at ¶¶ 26–33]. Bard attempts to counter this by arguing that when deposing Dr. Lung, Milton never gave her the underlying information that shows the G2X has a higher complication rate, so, argues Bard, her testimony that she would not have implanted the filter is merely speculation and insufficient to survive a summary judgment challenge on proximate cause grounds. *See* [Doc. 61, pp. 10-11].

Bard's argument falls short. Dr. Lung's testimony is that had she known the G2X had a "much higher" complication rate than other filters, she would not have implanted it. *See* [Doc. 66-1, p. 21]. Indeed, Dr. Lung testified that had she known Bard's retrievable filters migrate or tilt at a rate four to five times higher than Bard's other filters, she would not have implanted Milton with the G2X. [*Id*.]. And, again, Milton has introduced evidence that purportedly shows the G2X has a complication rate 14 times higher than one of Bard's other IVC filters—the SNF. [Doc. 66-1, p. 18]. Bard will have an opportunity to question Dr. Lung at trial as a jury determines whether Milton has met his burden as to the proximate cause element.

In sum, the Court reaches the same conclusion as the court in *Cason*. Milton has put forth evidence sufficient to survive a summary judgment challenge on the issue of proximate causation.

### 2. Causation of abdominal pain and other injuries

Bard also argues that Milton's claims for abdominal pain and other injuries fail as a matter of law because Milton proffers no expert testimony to establish causation as to

13

any of those injuries. *See* [Doc. 61, pp. 11–14]. Milton concedes that he has not designated a medical doctor as a retained expert hired specifically to testify as to medical causation in this case, but argues that the lack of a retained expert is not dispositive since Milton may satisfy his burden of proof in other ways. *See* [Doc. 66, p. 10].

Milton points to the testimony of Dr. Brewster and Dr. Patel as his causation expert testimony. *See* [Doc. 66, p. 11]. Bard argues that Dr. Brewster never actually testified as to the abdominal or other injuries Milton seeks damages for and limits his testimony to the filter's piercing of the caval wall which caused the pseudoaneurysm and necessitated placement of the aortic cuff. And Bard argues that the testimony of Dr. Patel is not properly before this Court.

First, the Court will consider whether Dr. Brewster's testimony establishes causation. Milton designated Dr. Brewster as a non-retained testifying expert in this case. *See* [Doc. 66-1, p. 22]. Federal Rule of Civil Procedure 26(a)(2)(C) permits treating physicians, when properly designated as a non-retained expert, to testify as both a fact and non-retained expert witness. This was a focal point of the Court's previous order in this case when it re-opened discovery for the purpose of allowing the parties to depose Dr. Brewster. *See* [Doc. 60, pp. 19–21].

Georgia law permits treating physicians to offer testimony that implicates their "special experience as a physician" so long as the testimony is "an account of their

observations during the treatment or if it is offered for the purpose of explaining the physician's decision-making process or the treatment it provided." *Eberhart v. Novartis Pharms. Corp.*, 867 F. Supp. 2d 1241, 1252–53 (N.D. Ga. 2011). Dr. Brewster testified that the perforating strut on Milton's G2X IVC Filter more likely than not caused the pseudoaneurysm. [Doc. 66-1, p. 22]. Dr. Brewster also opines that the strut necessitated the surgical placement of an aortic cuff. [*Id.* at p. 13]. The parties seem to agree that Dr. Brewster's testimony establishes causation as to the pseudoaneurysm and the required placement of the aortic scuff. Milton and Bard disagree about whether Dr. Brewster's testimony establishes causation as to Milton's abdominal pain, or to any other injury apart from the pseudoaneurysm and the required placement of the aortic strut. *See* [*Id.* at pp. 13–14]. Consider the following excerpt from Dr. Brewster's deposition:

> Q: Doctor, is that finding of a strut and a pseudoaneurysm in the aorta of medical significance to you?
> A: It *could* contribute to abdominal pain and it worries me as to the stability of the aorta of that area.
> Q: And can you explain what you mean by that, sir?
> A: Abdominal pain is something that can impair our patients and is not uncommon with the IVC filters going through the vena cava and irritating other areas.

[Doc. 64, pp. 3–4 (emphasis added)]. Dr. Brewster does not testify that the complications resulting from Milton's G2X Filter actually caused his abdominal pain—he merely testifies that it is possible it did. Nor does any other portion of Dr. Brewster's declaration or deposition show him testifying that Milton's filter caused anything other

15

than the pseudoaneurysm or cuff placement. Therefore, Dr. Brewster's testimony establishes causation as to those injuries alone.

Next, the Court will determine whether it may consider Dr. Patel's testimony. Bard points out that Dr. Patel's declaration was never served on Bard and was not filed with Milton's response materials. [Doc. 70, p. 7]. Indeed, Milton's Controverting Statement of Facts [Doc. 66-1] contains no reference to a Dr. Patel at all. Milton seemingly tries to group Dr. Patel's testimony in with Dr. Brewster's and cites to portions of the record that contain references to Dr. Brewster and have no mention of Dr. Patel. *See* [Doc. 66, pp. 10–11]. Therefore, as best the Court can tell, the testimony of Dr. Patel is not properly before the Court and may not be considered. *See* M.D. Ga. L.R. 56 ("Material facts not supported by specific citation to particular parts of materials in the record … will not be considered by the court."); Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record"); *Wallace v. Smith*, 297 F. App'x 915, 916 (11th Cir. 2008) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

In sum, the Court **GRANTS** Bard's Motion for Summary Judgment as to Milton's claims for damages flowing from anything other than the pseudoaneurysm and the placement of the aortic cuff.

### 3. Punitive damages

Bard argues that Milton's claim for punitive damages fails as a matter of law. *See* [Doc. 61, pp. 15–16]. Under Georgia law, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). "In any case in which punitive damages are claimed, the trier of fact shall first resolve from the evidence produced at trial whether an award of punitive damages shall be made." O.C.G.A. § 51-12-5.1(d)(1). "Numerous Georgia cases have held that punitive damages are available where a manufacturer knows that its product is potentially dangerous and chooses to do *nothing* to make it safer or to warn consumers." *Cason*, No. 1:12-cv-1288-MHS, 2015 WL 9913809, at *3 (quoting *Cisson v. C.R. Bard, Inc.*, No. 2:11-cv-00195, 2013 WL 5700513, at *13 (S.D. W.Va. Oct. 18, 2013) (applying Georgia law)).

Milton argues that Bard knew the G2X Filter had higher risk of complications that could result in death or serious injury, and actively sought to conceal this information from the public. [Doc. 66, pp. 12-13]. Bard counters that punitive damages are inappropriate when based on alleged conduct that did not contribute to or cause Milton's injury. [Doc. 70, pp. 8-9]. True, a "defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive

17

damages." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). The Court finds that the conduct that serves as the basis for Milton's punitive damages claim—Bard's failure to warn of the risks associated with the G2X Filter and calculated decision not to do so—is not an independent or separate act from the actions serving as the basis of Milton's failure-to-warn claims against Bard. Even Bard seems to acknowledge this.

Bard's argument for why an award of punitive damages is inappropriate as a matter of law is derivative of its argument for why Milton's failure-to-warn claim fails. *See* [Doc. 70, p. 8 (arguing that Milton was not injured by a failure to warn and that punitive damages cannot be based on conduct that did not contribute to his injury)]. The Ninth Circuit considered a similar situation and applied Georgia law to conclude the evidence was sufficient to support a jury award of punitive damages. *See In re Bard IVC Prod. Liab. Litig.*, 969 F.3d 1067, 1077 (9th Cir. 2020). The court's analysis is helpful here:

> Bard's challenge to the punitive damages award is largely derivative of its argument that it had no duty to warn of comparative risks. In Bard's view, punitive damages are inappropriate because it sold a product that was "not defective and sold with an adequate warning." But the jury found that the warning was not adequate. As the district court explained, "[t]he evidence supported a finding that despite knowing that G2 filters placed patients at a greater risk of harm" than other available filters, "Bard chose not to warn physicians and instead downplayed the risk." Although it would have been possible for the jury "to draw a contrary conclusion," we conclude that the evidence was adequate to support the jury's award of punitive damages.

*Id*. As discussed in the failure-to-warn section above, Milton puts forth evidence that shows Bard chose not to warn of higher risks associated with the G2X Filter implanted in Milton. This is enough to let the jury consider the question of punitive damages.

Bard also argues that Milton's punitive damages claim fails because it complied with applicable government regulations and no other culpable conduct is shown. *See* [Doc. 61, p. 15]. Milton disputes whether Bard complied with the regulations as it pertains to the G2X Filter, [Doc. 66, pp. 13-14], but even assuming Bard did, Milton's punitive damages claim survives Bard's summary judgment challenge. The Georgia Supreme Court has articulated "a general rule" that punitive damages are "improper where a defendant has adhered to . . . safety regulations." *Stone Man, Inc. v. Green*, 435 S.E.2d 205, 206 (1993). But that rule does not "preclude[ ] an award of punitive damages where, notwithstanding the compliance with applicable safety regulations, there is other evidence showing culpable behavior." *General Motors Corp. v. Moseley*, 447 S.E.2d 302, 311 (Ga. 1994), *abrogated on other grounds by Webster v. Boyett*, 496 S.E.2d 459 (Ga. 1998). When a failure to warn reflects "a conscious disregard for the safety of others," punitive damages may be appropriate. *Zeigler v. CloWhite Co.*, 507 S.E.2d 182, 185 (Ga. Ct. App. 1998).

Milton puts forth evidence that Bard knew about the higher risks associated with the G2X Filter yet chose not to warn of these risks which would constitute "conscious disregard for the safety of others." *Id*. A jury should have a chance to determine

whether that version of the facts is correct, and, if it does, decide whether to award Milton punitive damages. Therefore, Bard's motion is due to be **DENIED** and Milton's claim for punitive damages may proceed to determination by a jury.

## CONCLUSION

In conclusion, Bard's Motion for Summary Judgment [Doc. 61] is **GRANTED in part** and **DENIED in part**. Accordingly, Milton's claims for failure to warn, defective or negligent design, and punitive damages shall proceed to a trial by jury, and Milton's claims for damages stemming from anything other than his pseudoaneurysm and aortic cuff placement are dismissed. The Court will place the case on the next available trial calendar.

**SO ORDERED**, this 17th day of June, 2021.

S/Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**